*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVID RASHAAD MCCRACKINS,

        Defendant-Appellant.

UNPUBLISHED
February 03, 2026
2:29 PM

No. 371551
Wayne Circuit Court
LC No. 21-005224-01-FC

Before: RIORDAN, P.J., and GARRETT and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a); felon in possession of a firearm (felon-in-possession), MCL 750.224f; carrying a concealed weapon (CCW), MCL 750.227; and two counts of carrying a firearm during the commission of a felony (felony-firearm), second-offense, MCL 750.227b(2). The trial court sentenced defendant to life imprisonment for the first-degree murder conviction and to lesser sentences for the remaining convictions. Defendant argues that the trial court admitted inadmissible hearsay in violation of his Confrontation Clause rights and his trial counsel rendered ineffective assistance of counsel by failing to prepare for trial. In his Standard 4 brief, defendant argues that trial counsel was ineffective for failing to object to the verdict form and that the monitoring of his jail telephone calls violated his constitutional equal-protection rights and his protections against unreasonable searches and seizures. We affirm.

## I. FACTS

Defendant's convictions arise out of the fatal shooting of Anthony Gaskin outside a residence on Ashton Street in Detroit ("Ashton"). Defendant regularly sold fentanyl to Casie Polk and her boyfriend, Jason Coleman, in Flint. While they usually paid defendant in cash, they sometimes drove him to Detroit and back to Flint in exchange for a tank of gas and a gram of fentanyl. Polk and Coleman never met Gaskin, but Polk knew him as the person from whom defendant purchased drugs, and Coleman saw Gaskin each time he traveled to Detroit with defendant.

-1-

On February 4, 2021, Gaskin told his girlfriend, Alisha James, he was meeting defendant at Ashton, and he left their home driving James's blue Chevrolet Trailblazer. The same morning, Coleman agreed to drive defendant to Detroit in his white Mitsubishi Outlander SUV. Once they arrived in Detroit, defendant directed Coleman to Ashton, and Coleman parked his vehicle on the street. Defendant got out of the vehicle, walked a couple houses down, and knocked on a door while Coleman remained in the vehicle. At some point, Coleman saw a blue Trailblazer park a few houses away. Coleman did not see Gaskin exit the Trailblazer, but he observed Gaskin arrive in the same type of vehicle on previous occasions to meet defendant. Coleman watched Gaskin cross the street and walk toward Coleman's vehicle, but Coleman looked down when Gaskin was about 10 feet away, almost directly in front of the driver's side of Coleman's vehicle. Coleman looked up when he heard gunshots and saw Gaskin fall. Coleman also saw defendant standing approximately six feet away with his arm extended and a weapon in his hand. Defendant got back into Coleman's vehicle and told Coleman to "go," at which point Coleman drove away.

Detroit Police Officer Wesley Cowan-Williams responded to the scene and spoke with three witnesses, who reported seeing a white male driver and a black male passenger flee the scene in a white SUV. The witnesses described the vehicle as a Kia rather than a Mitsubishi. Less than a week later, Coleman was arrested and charged for his role in the incident, at which point he identified defendant as the shooter and gave police permission to search his cell phone. Jacob Bullock, an analyst with the Detroit Police Department, obtained phone records for defendant's phone and Coleman's phone. On February 4, 2021, five phone calls were exchanged between the two phones, with the first call at 8:35 a.m. and the last call at 10:22 a.m. Between 10:47 a.m. and 12:33 p.m., three phone calls were exchanged between defendant's phone and Gaskin's phone, with the last call occurring at 12:20 p.m. from defendant to Gaskin. Cell tower data revealed that defendant's phone was in Flint at 10:47 a.m. and that it traveled southbound on I-75 toward Detroit before stopping at Ashton from about 12:20 p.m. to 12:33 p.m. Bullock's analysis of Coleman's phone indicated the same travel pattern.

In July 2021, Coleman signed a plea agreement to testify against defendant. In January 2023, Polk received a phone call from defendant while he was incarcerated in jail pending trial. Unbeknownst to defendant, the call was recorded. Defendant told Polk that she needed to have Coleman "switch it up a little bit." Defendant mentioned $10,000, along with something "about someone coming from the side." Polk believed defendant wanted her to talk to Coleman "about changing the story of someone else coming out the side and shooting Mr. Gaskin." Coleman believed that defendant's statement was a combination of a threat and a bribe. The trial court granted the prosecution's motion to admit evidence of the recording at trial.

The jury convicted defendant as charged. This appeal followed.

## II. OFFICER COWAN-WILLIAMS'S TESTIMONY

Defendant argues that Officer Cowan-Williams's testimony regarding what the three witnesses at the scene told him constituted inadmissible hearsay and that the admission of the evidence denied him his right to confront the three witnesses. We review for an abuse of discretion decisions regarding the admission of evidence. *People v Smith*, 336 Mich App 79, 105; 969 NW2d 548 (2021). "We review de novo preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, and it is an abuse of discretion to admit

evidence that is inadmissible as a matter of law." *Id*. at 105-106. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 259; 749 NW2d 272 (2008). Although defendant preserved his hearsay argument for this Court's review by raising the issue in the trial court, he failed to preserve his Confrontation Clause argument for our review. We therefore review that issue for plain error affecting his substantial rights. *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. [*People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted).]

"If defendant satisfies those three requirements, we must make a fourth determination: whether the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence." *People v Anderson*, 341 Mich App 272, 280; 989 NW2d 832 (2022).

"In general, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—may not be admitted into evidence." *People v Green*, 313 Mich App 526, 531; 884 NW2d 838 (2015); see also MRE 801; MRE 802. Hearsay is inadmissible unless it "falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence." *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013) (citation omitted); see also MRE 802; MRE 803. "If, however, the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay." *Musser*, 494 Mich at 350.

The trial court determined that the challenged statements were not offered for their truth, but rather, to show how they furthered the investigation. Defendant contends that Officer Cowan-Williams "should have been asked not what the witnesses said but what he did in furtherance of his investigation as a result of speaking with the witnesses." Although perhaps preferable, because the statements were not admitted for their truth, but rather, to show what the police did after receiving the information, the statements did not constitute hearsay. "[A] statement offered to show why police officers acted as they did is not hearsay." *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007). Sergeant Enrique Jackson testified that he was instructed to view surveillance video footage of certain intersections for a white SUV.

"Controversies over the admission of hearsay statements may also implicate the Confrontation Clause, which guarantees a criminal defendant the right to confront the witnesses against him or her." *People v Dendel (On Second Remand)*, 289 Mich App 445, 452-453; 797 NW2d 645 (2010) (citation omitted); see US Const, Am VI; Const 1963, art 1, § 20.

> [T]he Sixth Amendment bars the admission of testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. A pretrial statement is testimonial

if the declarant should reasonably have expected the statement to be used in a prosecutorial manner and if the statement was made under circumstances that would cause an objective witness reasonably to believe that the statement would be available for use at a later trial. [*Id*. at 453.]

"However, the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted." *Chambers*, 277 Mich App at 10-11. "[A] statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation Clause." *Id*. at 11.

In *Chambers*, the police received information regarding the defendant from an FBI agent. *Id*. at 4. The FBI agent told a detective that one of the agent's informants identified the defendant as the suspect, but neither the FBI agent nor the informant testified at the defendant's trial. *Id*. at 4, 10. Instead, the detective testified that the FBI agent called and informed him of the defendant's identity, after which the police set up surveillance at the defendant's home. *Id*. at 10. The defendant argued that he was denied his right of confrontation. *Id*. This Court disagreed, stating:

[T]he challenged testimony did not violate defendant's right of confrontation. The testimony was not offered to establish the truth of the informant's tip. Rather, it was offered to establish and explain why the detective organized a surveillance of defendant's home and how defendant came to be arrested. Because the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted, the testimony did not violate defendant's right of confrontation. [*Id*. at 11.]

Similar to *Chambers*, in the instant case Sergeant Jackson viewed video footage for a white SUV after the three witnesses told Officer Cowan-Williams that a white SUV was involved, although they erroneously identified the SUV as a Kia. Defendant does not meaningfully address this substantive rationale or its underlying authority, or explain how his position might prevail in spite of it. Because Officer Cowan-Williams's testimony was offered to show how the witness statements furthered the investigation, defendant's rights under the Confrontation Clause were not violated.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

A claim of ineffective assistance of counsel "presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). "The trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "Where claims of ineffective assistance of counsel have not been preserved, our review is limited to errors apparent on the record." *Matuszak*, 263 Mich App at 48.

The United States and Michigan Constitutions entitle a criminal defendant to the assistance of counsel. US Const, AM VI; Const 1963, art 1, § 20. Counsel's representation must be effective to satisfy the constitutional requirement. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "Effective assistance of counsel is strongly presumed, and the defendant bears the heavy burden of proving otherwise." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021) (citations and quotation marks omitted). "In order to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023) (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A. FAILURE TO PREPARE FOR TRIAL

Defendant argues that his trial counsel was ineffective for failing to prepare for trial, citing four examples indicating counsel's alleged unpreparedness: (1) failing to prepare and file a written response to the prosecution's motion to admit the jail telephone call; (2) failing to review the preliminary examination transcript before trial, yet relying on it to impeach Coleman; (3) stating that he misheard the trial court because he was "sleepy;" and (4) failing to understand the Michigan Rules of Evidence, as demonstrated by his attempt to admit inadmissible double hearsay. Defendant asserts that it is "reasonable to expect and conclude that, had [he] been represented by competent counsel at trial, the outcome of . . . trial would have been substantially more favorable to him." Even assuming that trial counsel's performance was deficient, however, there is no indication of a reasonable probability that the alleged errors affected the outcome. The most damaging evidence against defendant was Coleman's testimony. Coleman testified that he saw defendant with a gun in his outstretched hand immediately after hearing gunshots. Coleman also identified his vehicle and Gaskin's vehicle on video footage of them arriving at the scene, and Bullock testified that the locations of defendant's phone and Coleman's phone leading up to the shooting corroborated Coleman's testimony. Considering the evidence against defendant, he has failed to show a reasonable probability that the outcome of trial would have been different but for the alleged errors.

Further, the record does not indicate that trial counsel was unprepared for trial. Counsel stated that he had read the prosecutor's pretrial motion and listened to the jail telephone call, and he argued against the admission of evidence involving the phone call. Regarding the impeachment of Coleman, trial counsel noted specific page and line numbers when referencing the preliminary examination transcript, indicating that he had reviewed the transcript. The record shows that counsel requested a break specifically to look for something in the transcript at defendant's request. While counsel remarked at one point that he was sleepy, the record does not indicate that he was falling asleep and defendant does not indicate that he was. Finally, the double-hearsay exchange does not indicate that counsel lacked an understanding of the rules of evidence or hearsay, particularly considering that defendant reiterates one of trial counsel's hearsay arguments on appeal. Accordingly, defendant has failed to establish an entitlement to relief.

B. FAILURE TO OBJECT TO THE VERDICT FORM

-5-

In his Standard 4 brief, defendant argues that the verdict form was defective, and trial counsel's failure to object to the form prejudiced him and denied him a fair trial. An issue regarding the verdict form is generally treated as an issue involving the jury instructions. *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Wade*, 283 Mich App 462, 467; 771 NW2d 447 (2009) (quotation marks and citation omitted). Jury instructions should be considered in their entirety when determining whether an error occurred. *Id*. at 464. "[E]ven if somewhat imperfect, instructions do not create error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id*. "Further, a criminal defendant is deprived of his constitutional right to a jury trial when the jury is not given the opportunity to return a general verdict of not guilty." *Id*. at 467.

Defendant was charged with first-degree premeditated murder and argues that the verdict form did not provide a "not guilty" option for the lesser included offense of second-degree murder. In *Wade*, the verdict form allowed the jury to select: (1) guilty or not guilty of first-degree murder, or (2) guilty of the lesser included offense of second-degree murder, or (3) guilty of the lesser included offense of involuntary manslaughter. Both lesser offenses were separated from the first-degree murder option with the word "or," but neither included a "not guilty" option, and there was not a general "not guilty" option for all three offenses. The jury convicted the defendant of involuntary manslaughter. This Court reversed on the basis that the verdict form was defective "because it did not give the jury the opportunity to return a general verdict of not guilty." *Wade*, 283 Mich App at 465-468. This Court noted, however, "that the verdict form would not have been defective if it had included a box through which the jury could have found [the] defendant not guilty of second-degree murder and not guilty of involuntary manslaughter." *Id*. at 468.

Contrary to defendant's assertions, his verdict form contained a general "not guilty" option. The verdict form identified count one as "homicide–murder first degree-premeditated," and allowed the jury to select one of three boxes: (1) not guilty, (2) guilty of first-degree premeditated murder, or (3) guilty of second-degree murder. Similarly, the verdict form identified count four as "weapons–felony[-]firearm," and allowed the jury to select one of three boxes: (1) not guilty, (2) guilty of weapons–felony-firearm as to first-degree premeditated murder, or (3) guilty of weapons–felony-firearm as to second-degree murder. Unlike the verdict form in *Wade*, there was no "or" separating the guilty option for second-degree murder from the other two options on defendant's verdict form.

Defendant acknowledges the absence of the word "or" separating the charged crime of first-degree premeditated murder from the lesser included offense of second-degree murder, but, citing *People v Grondin*, unpublished per curiam opinion of the Court of Appeals, issued June 12, 2018 (Docket No. 331809),[1] he argues that this absence contributes to the defectiveness of the form. Defendant misunderstands the *Grondin* Court's explanation. In *Grondin*, this Court compared the verdict form to the model form in M Crim JI 3.26, concluding that the "most

---

[1] Although unpublished opinions of this Court are not binding precedent, they may be considered instructive or persuasive. *People v Jamison*, 292 Mich App 440, 445; 807 NW2d 427 (2011), lv den 490 Mich 934 (2011); see also MCR 7.215(C)(1).

significant difference" was "that the model form does not contain an 'or' separating the charged crime and the lesser included offense."  Finding the verdict form unconstitutional, this Court explained that the use of "or" "suggests that if the jury decides to move on from the charged crime, it must choose the guilty option for the lesser included offense," whereas the absence of "or" in the model form "provides that there is only one crime, and the options are not guilty, guilty of first-degree murder, or guilty of second-degree murder."  *Grondin*, unpub op at 16.  Because defendant's argument is premised on his misinterpretation of the caselaw, his argument fails.

Defendant also argues that the trial court's instructions to the jury did not cure the defects regarding the verdict form.  But, as explained, defendant has failed to establish that his verdict form was defective.  Nonetheless, we note that, after explaining the elements of first-degree premeditated murder, the trial court instructed the jury that it could "also think of the lesser charge of second-degree murder," before it outlined those elements.  The court then stated: "If you find the defendant guilty of murder you must state in your verdict whether it is murder in the first-degree or murder in the second-degree."  Later, the trial court instructed the jury:

> I've already given you instructions regarding a lesser offense.  As to any account [sic] which includes a lesser offense you must first consider the principal offense.  So in this instance the principal offense is first-degree murder.  The lesser offense is second-degree murder.
>
> If you all agree that the defendant is guilty of that offense you need not consider the lesser offense.  If you believe that the defendant is not guilty of the principal offense or if you cannot agree on that offense you may consider the lesser offense.

Finally, the trial court instructed:

> The defendant is charged with five counts.  That is the crime of first-degree murder, weapons firearms possession by a felon, concealed weapon, and two counts of felony firearm.  As the Court has already indicated these are separate crimes and the prosecutor is charging that the defendant committed all of them.
>
> You must consider each crime separately in light of all of the evidence in this case.  If you find the defendant guilty of all, you may find the defendant guilty of all, any[ ]one or any combination of these crimes or not guilty.

In sum, the trial court informed the jury that (1) defendant was charged with first-degree premeditated murder for which second-degree murder was the lesser included offense, (2) they had the option to find defendant guilty or not guilty of any combination of the charged crimes, and (3) if the jury found defendant guilty of murder, the verdict form needed to state whether it was first-degree or second-degree.  Considering the jury instructions as a whole, the jury would reasonably have understood that the three options on the verdict form were: (1) not guilty of murder, (2) guilty of first-degree premeditated murder, or (3) guilty of second-degree murder.  As such, the verdict form was not defective, and defendant was not denied a fair trial.

Because defendant failed to establish that error occurred, any objection to the verdict form by trial counsel would have been futile, and counsel is not ineffective for failing to raise a futile

objection. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."). Accordingly, defendant's ineffective-assistance claims fail.

## IV. RECORDED PHONE CALL

Also in his Standard 4 brief, defendant argues that the trial court erred by admitting evidence involving his phone call to Polk made while he was in jail. Specifically, he contends that the admission of the evidence violated his constitutional right to equal protection and his Fourth Amendment right against unreasonable searches and seizures. Although defendant objected to the admission of the evidence in the trial court, he did not raise the constitutional arguments that he now asserts in this Court. Our review is therefore limited to plain error affecting his substantial rights. *Anderson*, 341 Mich App at 279.

"Both the United States and Michigan Constitutions guarantee equal protection of the law." *People v Konopka (On Remand)*, 309 Mich App 345, 367; 869 NW2d 651 (2015). "The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment." *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000). "Conversely, the Equal Protection Clauses do not prohibit disparate treatment with respect to individuals on account of other, presumably more genuinely differentiating, characteristics." *Id*. "The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Rodriguez*, 327 Mich App 573, 583; 935 NW2d 51 (2019). "[A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Mahdi*, 317 Mich App 446, 457-458; 894 NW2d 732 (2016) (quotation marks and citation omitted).

Defendant contends that the monitoring and recording of his phone call to Polk constituted a search in violation of his constitutional guarantees against unreasonable searches and seizures and that the government's actions violated his equal-protection rights because he was treated differently from persons with the financial resources to post bail. Whether an individual has a reasonable expectation of privacy, and thus whether the government's intrusion constitutes a search, depends on two questions: "First, did the individual exhibit an actual, subjective expectation of privacy? Second, was the actual expectation one that society recognizes as reasonable?" *People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (quotation marks and citations omitted). "Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion." *Id*. (quotation marks and citation omitted).

Because defendant did not have a reasonable expectation of privacy during his jail phone calls, his constitutional rights against unreasonable searches and seizures were not implicated. Corporal Michael Solberg from the Wayne County Sheriff's Department testified that an inmate making a phone call must enter a six-digit code along with a four-digit code to do so. The codes are unique to each individual inmate. Thus, it was known which inmate called which phone number at any given time. In addition, courts have long determined that an inmate's subjective belief in the privacy of his phone calls is not reasonable. See *United States v Van Poyck*, 77 F3d

285, 290-291 (CA 9, 1996) ("[N]o prisoner should reasonably expect privacy in his outbound telephone calls."); *Bradley v Mason*, 833 F Supp 2d 763, 769 (ND Ohio, 2011) ("[S]ociety does not acknowledge that a prisoner has a reasonable expectation of privacy in telephone calls made from within the jail to individuals other than his attorney."). Accordingly, the monitoring and recording of defendant's phone call to Polk did not constitute a search within the meaning of the federal and state constitution.

Further, it is well-recognized that "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual." See *Bell v Wolfish*, 441 US 520, 546; 99 S Ct 1861; 60 L Ed 2d 447 (1979). "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* The crux of defendant's equal-protection argument is that, had he been released on bail, a warrant would have been required to record his telephone calls. While this may be true, defendant was not denied equal protection of the law. "In order to show an equal protection violation, defendant must show that (1) he has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment." *People v Abraham*, ___ Mich App ___, ___; ___ NW2d ___ (2025) (Docket No. 364574); slip op at 4 (quotation marks and citation omitted). "To be similarly situated to an identified group, defendant must show that he is comparable in all material respects to the members of that group." *People v James*, 326 Mich App 98, 106; 931 NW2d 50 (2018). Because defendant was incarcerated, with its concomitant concerns regarding institutional security and order, he was not comparable in all material respects to unincarcerated persons and was therefore not similarly situated to such persons. Accordingly, defendant has failed to establish plain error affecting his substantial rights.

Affirmed.

/s/ Michael J. Riordan
/s/ Kristina Robinson Garrett
/s/ Philip P. Mariani